**In re ZHANG.**

[Cite as *In re Zhang* (1999), 135 Ohio App.3d 350.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 73001.

Decided June 10, 1999.

*Kent R. Minschall, Jr.,* for appellant Sin N. Kim, guardian *ad litem* of the mother, Sue Chen.

*Patrick P. Leneghan,* for the child, Rhonda Zang.

*Donald Green, Darin Thompson* and *Margaret Isquick,* Assistant Public Defenders, for the mother, Sue Chen.

*Deena Miller* and *Lynn Stewart,* for Cuyahoga County Department of Children and Family Services.

*John H. Lawson,* for the foster mother, appellee Laura Hong.

O'DONNELL, Presiding Judge.

Sin N. Kim, the guardian *ad litem* of Sue Chen, who is the natural mother of Rhonda Zhang, a minor, appeals from an order of the juvenile court that terminated Chen's parental rights and granted legal custody of Rhonda to Laura Hong, Rhonda's foster mother. Kim argues that the court erred in failing to appoint counsel to represent Chen at the hearing where it terminated parental rights, abused its discretion by allowing Hong to intervene in the case, and further claims the court erred because it terminated Sue Chen's parental rights without any evidence of Sue Chen or Rhonda's living conditions at the time the court entered its order.

After a thorough review of the matter, we have concluded the court did not err or abuse its discretion when it permitted Chen's counsel to withdraw, allowed Laura Hong to intervene, and terminated Sue Chen's parental rights.

The record here reveals that Sue Chen, an unmarried Chinese citizen who had resided in the United States since 1980, gave birth to Rhonda Zhang on November 4, 1993. On June 25, 1994, after being stopped for a traffic violation, police arrested Chen for bribery when she tried to pay the officer to ignore her violation, and placed her daughter, Rhonda, in shelter care in Lucas County. On July 1, 1994, because Chen resided in Cuyahoga County, the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "Family Services") obtained temporary custody of Rhonda from Lucas County and placed her in foster care. On September 28, 1994, the court returned legal custody of Rhonda to Chen, and recommended that the child be committed to the protective supervision of CCDCFS and that the mother comply with the Family Services case plan, which required her to maintain stable housing, complete psychological counseling, and learn parenting skills.

On December 15, 1994, due to Chen's diagnosis of schizophrenia and her noncompliance with a prescribed medication regimen, her belief that she did not need psychotropic medication, her subsequent eviction from her apartment, her lack of basic parenting skills, and her inability to fully understand the emotional needs of her child, the court granted Family Services temporary custody of Rhonda and again placed her in foster care. Subsequently, on March 8, 1995, the court granted Family Services' request to place Rhonda in foster care with Laura Hong, an attorney who expressed an interest in being a foster parent. The child bonded primarily to her foster mother and made great strides in overcoming language and socialization deficiencies.

On October 15, 1996, during an overnight visitation with Rhonda, Chen disregarded an existing court custody order, abducted her child from the foster

mother, and absconded to the People's Republic of China, where she and Rhonda began living with Chen's parents.

At that time, the juvenile court ordered CCDCFS to file a motion for permanent custody, but the agency failed to do so. In addition, the guardian *ad litem* for Rhonda filed a motion before the court seeking to have the court order CCDCFS to become the permanent custodian of the child; also, the child's foster mother, Laura Hong, filed a motion seeking to become the legal custodian of the child. Thereafter, on December 13, 1996, the CCDCFS did file a motion to terminate its temporary custody of Rhonda, asserting that it had verified Chen had taken Rhonda to Cleveland Hopkins Airport, then to Chicago, and from there to Hong Kong, and presumably to the Peoples Republic of China; it sought an order to terminate its temporary custody of the child and to return custody of the child to Sue Chen without any restrictions. The court conducted a hearing on these motions on April 14, 1997, but before the hearing began, Chen's counsel moved to withdraw from the case informing the court she had not been able to contact her client for at least six months and had no idea how to proceed since she did not know her client's wishes. She therefore advised the court she could not represent her client zealously as required by the Canons of Legal Ethics. The court granted her motion and permitted Chen's counsel to withdraw. At that point, Chen's guardian *ad litem* moved to appoint new counsel for Chen, but the trial court denied that motion and proceeded with the hearing. However, Chen's guardian *ad litem*, an attorney, participated in the hearing on Chen's behalf.

Thereafter, on June 26, 1997, the juvenile court issued its judgment terminating Sue Ping Chen's parental rights and granting legal custody of Rhonda to Laura Hong, finding by clear and convincing evidence that:

"[Sue Chen] has failed continuously and repeatedly to substantially remedy the conditions that caused the child to be placed outside of her home, notwithstanding the reasonable case planning and efforts by the Cuyahoga County Department of Children Services to assist her in remedying those problems. [Chen] suffers from a chronic mental illness that makes her unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year from the holding of the within hearing. [Chen] caused the child to suffer serious emotional harm by abducting her and precipitously removing her from her home and the foster parents to whom she had grown psychologically bonded. [Chen's] abduction of the child was in clear violation of this court's orders [. Chen] continued to violate [the orders of the court] by not returning the child to this jurisdiction when commanded to do so."

Chen's guardian *ad litem* now appeals from this order and presents three assignments of error for our consideration. The first states:

"The juvenile court erred in violation of the Sixth and Fourteenth Amendment[s] to the United States Constitution, the Due Course of Law Guarantee of Section 16, Article I of the Ohio Constitution, Ohio Revised Code Section 2151.352 and Rule 4(A) of the Ohio Rules of Juvenile Procedure when it refused to appoint counsel to represent Sue Chen at the permanent custody hearing of her daughter Rhonda."

The issue of appointment of counsel in important juvenile court proceedings is mandated by Juv.R. 4(A). In cases involving termination of parental rights, courts have recognized this right. See, *e.g., State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 15 O.O.3d 3, 399 N.E.2d 66.

■ Based upon the facts in this case, however, the determination of the court to permit Chen's counsel to withdraw cannot be considered error or an abuse of discretion for three reasons: Chen abducted her child from the child's foster parents' home in violation of existing court orders, voluntarily absconded from the court's jurisdiction, and has chosen not to contact either her counsel or the court; Chen's counsel advised the court that she did not know what her client wanted her to do and therefore could not zealously represent her client; and the Juvenile Court Rules authorized Chen's guardian *ad litem*, also an attorney, to serve as her counsel.

The record before us reveals that Chen absconded from the court's jurisdiction in violation of a court order, and chose to remain out of contact with the court or her counsel. As a result, when the court commenced the termination hearing on April 14, 1997, Sue Chen's counsel, Margaret Isquick, sought leave to withdraw and represented that she had not been able to contact her client for six months. The court permitted Isquick to withdraw, and also denied a request from Sin Kim, Chen's guardian *ad litem*, to continue the matter and appoint new counsel.

■ The decision to grant a continuance is within the sound discretion of the trial court. *State v. Sowders* (1983), 4 Ohio St.3d 143, 144, 4 OBR 386, 387, 447 N.E.2d 118, 120. In *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080, the Supreme Court said that courts should attempt to balance any potential prejudice to a defendant against the court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice, including the length of the delay requested, whether other continuances have been requested and received, the inconvenience to litigants, witnesses, opposing counsel and the court, whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived, whether the defendant contributed to the circumstance that gives rise to the request for a continuance, and other relevant factors, depending on the unique facts of each case.

■ A court need not grant a continuance for purposes of securing new counsel where the request plausibly can be viewed as simply a delaying tactic or as otherwise unreasonable. See, *e.g., Sampley v. Atty. Gen. of North Carolina* (C.A.4, 1986), 786 F.2d 610. In this case, time was of the essence in conducting the hearing for termination of the mother's parental rights. The experts agreed that the child had primarily bonded to the foster mother, and the longer the child remained captive in China, the more likely it would be that the child would suffer emotional harm from the separation.

Next, we recognize that Isquick, as a professional, notified the court that she could not ethically represent her client zealously; further, the record does not reflect that newly appointed counsel would have been any more knowledgeable about the facts of the case or Chen's desires or needs, considering that Chen had voluntarily left the court's jurisdiction with her child in violation of court orders and failed to contact her existing counsel for six months.

In a well-reasoned opinion on different facts involving a request by a law firm to withdraw from a case involving sexual harassment where the firm believed its client would commit perjury, the court there, in ruling that the leave to withdraw should have been granted, noted:

"The only suggestion that the administration of justice nonetheless requires the firm's presence is the magistrate's observation that withdrawal will leave the defendant unrepresented. If so, that consequence lies on the defendant's head. Systemic interests are best served by remitting such litigants to their own devices rather than by forcing lawyers to put both their reputations and their treasury at the disposal of reprobates." See *A Sealed Case* (C.A.7, 1989), 890 F.2d 15, 18.

Finally, we note that R.C. 2151.281(C) provides:

"In any proceeding concerning an alleged or adjudicated delinquent, unruly, abused, neglected, or dependent child in which the parent appears to be mentally incompetent or is under eighteen years of age, the court shall appoint a guardian ad litem to protect the interest of that parent."

Similarly, Juv.R. 4 provides:

"(B) The court shall appoint a guardian ad litem to protect the interests of a child or incompetent adult in a juvenile proceeding when:

" * * *

"(3) the parent is under eighteen years of age or appears to be mentally incompetent;

" * * *

"(C)(1) When the guardian ad litem is an attorney admitted to practice in this state, the guardian *may also serve as counsel to the ward providing no conflict between the roles exist[s]*." (Emphasis added.)

Hence, Juv.R. 4(C) permits Chen's guardian *ad litem* to serve as her counsel, and lends credibility to the conclusion that the trial judge did not err in failing to appoint successor counsel to Sue Chen. See, also, *In re Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 232, 17 OBR 469, 471, 479 N.E.2d 257, 260, where the court stated:

"Juv.R. 4(C) expressly allows appointed counsel to also serve as guardian ad litem. * * *

"* * * The role of guardian ad litem is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest. The role of the attorney is to zealously represent his client within the bounds of the law. DR 7–101; DR 7–102."

Examination of the record in this case reveals the interests of the guardian *ad litem* for Sue Chen aligned with those of the role of her counsel, and hence representation by the guardian *ad litem* does not present any conflict-of-interest problem in this case. Because Sue Chen's guardian *ad litem* participated in the juvenile court proceedings on behalf of Chen and no conflict existed between her role as guardian *ad litem* and as counsel, Sue Chen had counsel during the juvenile court proceedings. This representation is further evidenced by the fact that Chen's guardian *ad litem* prosecuted this appeal to our court on Chen's behalf, and we entertained the appeal. Accordingly, this assignment of error is not well taken.

The second assignment of error states:

"The trial court abused its discretion when it allowed foster mother Laura Hong to intervene as a party."

Regarding the question whether a foster parent may intervene as a party in a juvenile proceeding, we initially note that Juv.R. 2(X) provides:

" 'Party' means a child who is the subject of a juvenile court proceeding, the child's spouse, if any, the child's parent or parents, or if the parent of a child is a child, the parent of that parent, in appropriate cases, the child's custodian, guardian, or guardian ad litem, the state, and any other person specifically designated by the court."

In the case of *In re Hitchcock* (1996), 120 Ohio App.3d 88, 97, 696 N.E.2d 1090, 1095, our court addressed the matter of intervention by a foster parent, and interpreted Juv.R. 2, which specifies who may have party status in a case, where we stated:

"Juv.R. 2 includes 'any other person specifically designated by the court' as a party. Pursuant to this rule, a juvenile court has wide discretion in affording any individual party status. An abuse of discretion connotes more than an error of law or judgment. It implies the court's attitude was unreasonable, arbitrary, or unconscionable."

There we concluded:

"The Abdullahs' motion for legal custody offered the juvenile court another dispositional option for its consideration. The juvenile court did not abuse its discretion by permitting the Abdullahs to remain as parties while their petition and all other evidence was examined." *Id.*

■ While a foster parent is not automatically entitled to party status, the court has wide discretion to name parties to a juvenile court action, and this discretion includes naming foster parents as parties. See *In re Franklin* (1993), 88 Ohio App.3d 277, 280, 623 N.E.2d 720, 722.

The best that can be said in this case is that the child welfare system failed miserably to protect the best interests of the child. The foster mother's understandable bond with the child placed her in the position of being an advocate for the child when those who had that responsibility failed to execute that responsibility.

The evidence showed that the mother cared more for her own selfish interests than those of her child. She repeatedly told her medical doctors that she only took her psychotropic medication in order to get her child back and, once reunified, she would discontinue her medication because she did not believe she suffered from any mental illness. The mother continued to show an inability to perform rudimentary parenting skills like diapering and recognizing childhood illnesses. The mother's refusal to acknowledge the extent of her past difficulties, coupled with the lack of a support base in the United States, would factor into the demands of raising a young child and would become "increasingly challenging from a developmental perspective."

Also, the agency must accept some share of the blame for its actions in this case, ranging from its continued refusal to see that reunification was no longer a viable option, to its shocking abandonment of the child after the mother abducted her and fled to China.

The progress notes compiled by the case worker originally assigned to the case convincingly show that despite months of special work, the mother did not develop the most rudimentary parenting skills. Despite this discouraging lack of progress, the agency continued to advocate reunification. Initially, reunification certainly was the goal, but reunification should have been abandoned once it

became clear it would be futile. See *Elmer v. Lucas Cty. Children Serv. Bd.* (1987), 36 Ohio App.3d 241, 523 N.E.2d 540.

In fairness to the agency, its own expert suggested that the mother have overnight visitation with the child. But the agency had reason to think that the mother might flee with the child. In February 1996, the social worker knew that the mother's family wanted her and the child to return to China, and the agency's own expert noted that the mother would like to return to China and her family. Knowing of the mother's desire to repatriate to China, the agency should have taken steps to terminate visitation once it told the court it would be filing a motion to terminate parental rights.

Perhaps most disturbing is the agency's refusal to fight for the child after she had been abducted to China. After months of denying the obvious, the agency agreed to follow the recommendation of its own expert, a psychologist assigned to review the matter. When the psychologist recommended that the foster mother be granted legal custody of the child, the agency capitulated and told the court it would file a motion to that effect. At the same time, it told various social workers on the case that they should prepare the mother for the "potential of losing Rhonda." However, the mother abducted the child, so the agency asked the court to reconsider a permanent custody motion since "for all practical matters, we may assume that they [mother and child] will not be returning to the United States now or in the near future."

This turn-around is mystifying under the circumstances, leaving the objective viewer with only one impression—that the agency chose expediency over the right thing. It defies comprehension that the agency would throw its hands up in surrender and desert a child it had been charged to protect.

This raises another point, the conduct of the social worker who assumed control of the case throughout the custody proceedings. That social worker signed an affidavit encouraging the court to consider the foster mother as a candidate for permanent custody, only to recant that affidavit days later on grounds that she felt compelled by the foster mother to sign the affidavit out of fear that the foster mother was "planning some type of manipulation."

A social worker should be free from bias and influence. The social worker testified that she specifically asked to be assigned to this case because she had some familiarity with the mother and child. Given this familiarity with the case, if the social worker believed the foster mother had been trying to influence the proceedings, the social worker should have immediately raised that point with her superiors or the court. Instead, the social worker recanted the affidavit and left her credibility and professionalism open to question.

None of this is intended to question the motives of either the agency or social worker, but the court could look askance at these actions and justifiably wonder if the agency and its employees were acting in the child's best interests. With that thought, the court could reasonably look to the foster mother as the only remaining defender of the child's best interests; consequently, the court did not abuse its discretion by permitting the foster mother to become a party to this action.

The third assignment of error states:

"The trial court erred in finding that clear and convincing evidence existed to support the termination of Sue Chen's parental rights where there was no evidence presented regarding the current conditions of Sue Chen and/or her child."

At the time of hearing on disposition in this case, the court considered all of the following: on October 25, 1996, the court had ordered CCDCFS to file a motion for permanent custody of Rhonda, but the agency had not done so; however, on December 13, 1996, it filed a motion pursuant to R.C. 2151.415(A)(2) to terminate temporary custody and to vest custody with Sue Chen, the natural mother of Rhonda. At the same hearing, Rhonda's guardian *ad litem* moved to have the court grant permanent custody of Rhonda to CCDCFS or to consider other dispositional options pursuant to R.C. 2151.353, such as long term foster care or granting legal custody to an interested individual. In addition, Rhonda's foster mother, Laura Hong, who had cared for Rhonda for eighteen months, moved the court to intervene in the case and for the court to terminate the parental rights of Sue Chen and to grant legal custody of Rhonda to the foster mother.

Faced with a situation where the agency had not complied with either the statute or the court's earlier order for it to file a request for permanent custody, the court nonetheless proceeded with its hearing.

We note that R.C. 2151.415(D)(3) states:

"Upon the filing of the motion by the agency *or, if the agency does not file the motion prior to the expiration of the extension period,* upon its own motion, the court, prior to the expiration of the extension period, *shall* conduct *a hearing* in accordance with division (B) of this section and issue an appropriate order of disposition." (Emphasis added.)

Notably, division (B) of R.C. 2151.415 reads:

"[T]he court, in accordance with the best interest of the child as supported by the evidence presented at the dispositional hearing, shall issue an order of disposition as set forth in division (A) of this section, except that all orders for

permanent custody shall be made in accordance with sections 2151.413 and 2151.414 of the Revised Code."

Division (A) of R.C. 2151.415 reads:

"[A]ny public children services agency or private child placing agency that has been given temporary custody of a child pursuant to section 2151.353 of the Revised Code, not later than thirty days prior to the earlier of the date for the termination of the custody order pursuant to division (F) of section 2151.353 of the Revised Code or the date set at the dispositional hearing for the hearing to be held pursuant to this section, shall file a motion with the court that issued the order of disposition requesting that any of the following orders of disposition of the child be issued by the court:

"(1) An order that the child be returned home and the custody of the child's parents, guardian, or custodian without any restrictions;

"(2) An order for protective supervision;

"(3) An order that the child be placed in the legal custody of a relative or other interested individual;

"(4) An order permanently terminating the parental rights of the child's parents;

"(5) An order that the child be placed in a planned permanent living arrangement;

"(6) In accordance with division (D) of this section, an order for the extension of temporary custody."

In dutiful compliance, the court followed R.C. 2151.415(A)(3) and (4) and entered its order terminating the parental rights of Sue Ping Chen and Xin Lian Zhang and all putative fathers and committed Rhonda to the legal custody of Intervener, Laura K. Hong. It then denied as moot the guardian's motion for permanent custody, and denied the motion of CCDCFS to grant permanent custody to Sue Chen. These orders comply with R.C. 2151.415(A)(3) and (4). Since the court made no order for permanent custody, pursuant to R.C. 2151.415(B), it had no obligation to comply with R.C. 2151.413 or 2151.414.

Here, upon complete review of the matter, we have concluded that the trial court's decision to terminate the parental rights of the mother, Sue Chen, is supported by the evidence contained in the record and is in the best interest of the child. Further, the grant of legal custody to Laura Hong complies fully with R.C. 2151.415(A)(3).

Accordingly, we affirm the court's judgment, which terminated the parental rights of Sue Chen and Xin Lian Zhang to the child, which permitted Laura Hong

to intervene, and which awarded legal custody of the child to Laura Hong, the child's foster mother.

*Judgment affirmed.*

PATTON, J., concurs.

ROCCO, J., dissents.

ROCCO, J., dissenting.

I respectfully dissent from the majority opinion because I believe not only that the trial court's order is fundamentally flawed but that the record of this case demonstrates the trial court committed plain error in several respects.

First, despite the majority opinion's lengthy justification for the trial court's order, the trial court's judgment entry cannot, as a matter of law, be considered to be a disposition that is in the best interests of the child because it has the effect of leaving Rhonda in limbo with regard to parental rights. The relevant portion of the entry states:

"It is therefore ordered that the motion of the intervenor for an order terminating parental rights and for legal custody is well taken and is granted. It is ordered that the parental rights of Sue Ping Chen and Xin Lian Zhang and all putative fathers are hereby permanently terminated. It is further ordered that [the] child herein is committed to the legal custody of the intervenor, Laura R. Hong. It is further ordered that the motion for permanent custody filed by the guardian ad litem *is denied as moot.* It is further ordered that the motion of the Cuyahoga County Department of Children Services for termination of custody is granted in part; the order previously entered in this matter granting the said department temporary custody is terminated. In so far as said motion prays for custody to be vested in the mother, said motion is denied."

It is obvious from the foregoing that the trial court, although it terminated the mother's parental rights, failed to vest those rights in any other party. This court previously has refused to permit such a result since it has the effect of both placing the juvenile court in the position of the child's parent and placing the child in a temporary arrangement which conceivably could last until the child is emancipated. *In re Hitchcock* (1996), 120 Ohio App.3d 88, 103, 696 N.E.2d 1090, 1099.

Such a result was obtained in this case because the trial court committed plain error in two additional respects: (1) it refused to honor the mother's fundamental constitutional right to counsel at the termination of the parental rights trial, and (2) it not only permitted appellee to intervene in the case, it considered her

motions even though, pursuant to the statutory scheme, they are completely unauthorized. The majority opinion now sanctions those errors without a sufficient consideration of the consequences of its decision.

In reviewing appellant's first assignment of error, this court has the duty to be mindful that because a parent's right to the companionship, custody and management of his or her children is viewed by the United States Supreme Court as a fundamental interest that "undeniably warrants * * * protection," it follows that "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Lassiter v. Dept. of Soc. Serv. of Durham Cty.* (1981), 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–2160, 68 L.Ed.2d 640, 650; see, also, *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–1395, 71 L.Ed.2d 599, 606.

Indeed, the matter is of such a nature that this court has declared "the termination of parental rights is the family law equivalent of the death penalty in a criminal case." *In re Hitchcock*, 120 Ohio App.3d at 101, 696 N.E.2d at 1098.

The majority opinion first justifies the resolution of appellant's first assignment of error by essentially declaring the mother's actions indicated she "voluntarily" waived her right to counsel. However, the United States Supreme Court has held that before a defendant in a capital case voluntarily may waive his or her right to counsel, he or she must be "competent" to do so. *Godinez v. Moran* (1993), 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321. Ohio law, moreover, as *Godinez* permits, has established, especially in termination of parental rights cases, a *more* stringent standard than the federal Constitution mandates for determining the requirement for counsel. See *Asberry v. Payne* (1998), 82 Ohio St.3d 44, 693 N.E.2d 794; *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 14, 15 O.O.3d 3, 8, 399 N.E.2d 66, 70–71; *In re Hitchcock, supra; McKinney v. McClure* (1995), 102 Ohio App.3d 165, 656 N.E.2d 1310; *In re Kriak* (1986), 30 Ohio App.3d 83, 30 OBR 140, 506 N.E.2d 556; R.C. 2151.352.

The trial court in this case made no finding that the mother was now "competent" prior to either its decision to permit her counsel to withdraw at the outset of the termination of parental rights trial or in its decision to deny appellant's motion to appoint new counsel. Cf. *State v. Allen* (Nov. 20, 1997), Franklin App. No. 97APA01–51, unreported, 1997 WL 723192. Since this trial was, in effect, a "death penalty" trial for the mother's family, it was the duty of the trial court to assign counsel for the mother under such circumstances, for a court is required to "indulge every reasonable presumption against the waiver of a fundamental constitutional right *including the right to be represented by counsel.*" (Emphasis added.) *State v. Fields* (July 6, 1998), Warren App. Nos.

CA97–09–100, CA97–09–101, CA97–11–118, unreported, 1998 WL 372367, citing *State v. Dyer* (1996), 117 Ohio App.3d 92, 95, 689 N.E.2d 1034, 1035.[1]

Moreover, this court previously has recognized that a waiver of the right to counsel may not be presumed by a trial court when, as in this case, a party has demonstrated an "inability * * * to effectively articulate his defense *pro se.*" *In re Gardner* (June 18, 1998), Cuyahoga App. No. 72642, unreported, 1998 WL 323577. To state otherwise in the majority opinion now sends an opposite message to trial courts, which may find difficult to reconcile with the earlier opinion.

The majority opinion additionally states that the mother's right somehow was forfeited when her original counsel advised the court that she could not "zealously represent her client." In the context of the record, however, the mother's original counsel's statement more properly is viewed as just another instance of her overall ineffectiveness than as an excuse to deny a client her fundamental right.

For example, original counsel never raised the issue of the applicability of R.C. 2153.353(F), the "sunset date," prior to the trial; rather, the termination by operation of law of the agency's temporary custody of Rhonda had been raised only by the child's guardian *ad litem.* The trial court's subsequent assertion of its jurisdiction despite the questionable circumstances,[2] moreover, never was challenged by original counsel. See *In re Young Children* (1996), 76 Ohio St.3d 632, 669 N.E.2d 1140.

Additionally, despite the plain terms of R.C. 2153.415(A), which provides that only an agency may file such motions, at no time prior to her withdrawal did the mother's original counsel move to strike appellee's motions to terminate parental rights and to confer legal custody.

---

1. *Fields* made this declaration of law in a case involving nothing more than violations of municipal ordinances; it certainly applies no less to cases involving the termination of a parent's rights to the supervision and companionship of her only child.

2. Of course, the trial court retained subject-matter jurisdiction; however, if the mother's guardian *ad litem* was correct when he asserted in his motion that the agency's custody by operation of law was to terminate on June 25, 1996, then no legal restraint prevented the mother from establishing China as the lawful residence for herself and her child. It follows the trial court clearly was without authority to terminate the mother's parental rights and award legal custody of her child to another. Beyond this, the original case thus was closed with a final order, the termination of custody by operation of law, from which, incidentally, no appeal ever was filed. Thereafter, the case could not be reopened simply by motions filed by appellee and CCDCFS. No new complaint was filed. Competent counsel should have explored these issues and challenged both the motions and the trial court's subsequent orders as nullities.

Most importantly, original counsel simply withdrew at the critical juncture of the proceedings. She neither gave notice of her intention nor, although she was ethically required to do so, requested the trial court to appoint new counsel for her client. EC 2–31; DR 2–110(A)(2). Original counsel failed even to request a continuance. For this reason, the majority opinion's reliance upon *State v. Unger* (1981), 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078, is misplaced.

Any sympathy with original counsel's stated reason for her withdrawal similarly is inappropriate. Attorneys who represent mentally challenged clients must be prepared for some difficulties in communication in even the best of legal situations; they cannot be permitted easily to walk away from their responsibilities in intricate situations. Indeed, not knowing his or her wishes is usually a problem with this type of client; protecting his or her due process rights and fair trial rights through the challenging of improper evidence often is as much as counsel can do in such cases.

In this case, permitting the mother's original counsel simply to withdraw at the very outset of the trial was a particularly cruel blow in view of the following: (1) the trial court decided to consider at that same hearing several issues, including the appellee's improper motions for both the termination of the mother's parental rights and for legal custody of Rhonda; (2) appellee, by and through the three attorneys representing her interests, had previously filed not only numerous subpoenas seeking all of the mother's medical and personal records, even the most dated, but also a motion *in limine* seeking to prevent the mother, an indigent citizen of another country, from presenting any evidence at the hearing; and (3) appellee, having been given party status by the trial court, had assembled a veritable "dream team" of excellent attorneys, who were well schooled in the nuances of juvenile law. Opposing them was an "incompetent," indigent and absent mother of another culture who "suffers from a chronic mental illness," according to the trial judge, and who, as a result of original counsel's inaction, had been ineffectively represented by counsel during the preliminary stages of the matter and ultimately was without any legal representation whatsoever at the critical trial stage. While three versus one at trial arguably would have done only minor damage to our adversarial approach to justice, three versus none was a flagrant denial of fundamental constitutional rights. *Powell v. Alabama* (1932), 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158.

Although the majority opinion finally justifies its resolution of the first assignment of error by stating the Juvenile Rules "authorized" appellant "to serve as" the mother's counsel, a review of the record demonstrates the trial court neither appointed appellant to serve in that capacity nor gave appellant time to prepare to serve in that capacity. Appellant's limited presence at the trial, therefore, could hardly suffice to comply with constitutional due process requirements. *In*

*re Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 232, 17 OBR 469, 470–471, 479 N.E.2d 257, 259–260; cf., *In re Merrick* (Feb. 11, 1998), Athens App. No. 97CA31, unreported, 1998 WL 51605.

The effect of the trial court's refusal to grant the mother her right to counsel is manifest both from a review of the transcript of the trial and from the majority opinion's resolution of this appeal.

Due to the importance of the potential penalty involved, Juv.R. 34(I) requires the trial court to apply the Rules of Evidence at permanent custody hearings; however, because the trial court in this case considered all of the motions at once, appellee, who was essentially unopposed, was permitted to circumvent the rule's mandate in many ways. The trial's failure to comply with the mandate of Juv.R. 34(I) greatly prejudiced the mother since it is upon mostly incompetent and inadmissible evidence[3] that the trial court based its decision to terminate the mother's parental rights and now, by extension, the majority opinion affirms that decision.

Any perusal of appellee's part in the proceedings below amply demonstrates the second impropriety committed by the trial court, that of considering appellee's motions in the first place. In doing so, it completely ignored the plain language of R.C. 2151.415(A).

By its terms, R.C. 2151.415(A) permits only a "public children services agency or private child placing agency" to file a motion for disposition. The trial court, therefore, committed plain error. See *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 122, 679 N.E.2d 1099, 1103–1104. As a matter of law, it could not entertain the motions to terminate parental rights and a motion to award legal custody since they had been filed by an intervening foster parent and by a party other than the children services agency; thus, it could not conduct a trial on those issues.

The statutory scheme with regard to dependent children has as its basis the welfare of the child. As this court recognized in *In re Hitchcock, supra*, the state has an interest in finding a supportive, protective, and permanent family environment for the child. In light of that decision, this court should not endorse a juvenile court's ill-considered policy that would permit foster parents to bypass the statutory scheme to secure permanency for Ohio's dependent children. The unintended consequence of the majority opinion's affirmance is to enable childless

---

**3.** Most of the evidence was introduced during the testimony of the agency social worker assigned to Rhonda's case. She testified from various documents neither that she could authenticate nor of which she could claim any personal knowledge, *e.g.*, notes of the previous social worker, letters from the mother's former attorney, police reports, and doctors' diagnoses of the mother.

couples with sufficient financial or legal resources to pursue "trial adoption." The couple would choose a child whose parents were in some difficulty, encourage the parents to agree to agency custody of the child, foster the child to determine if he or she is intelligent and fairly well adjusted, and then petition the juvenile court to both terminate parental rights and grant legal custody so that, subsequently, the *probate* court would have little discretion but to permit adoption by the couple. Cf., *In re Hitchcock, supra.*[4]

This result is not only unfair to childless couples who patiently wait for years for a child such as Rhonda to be available for adoption but, more importantly, it is inimical to the best interest of Ohio's children and, therefore, Ohio law to limit the "pool" of prospective adoptive parents to one couple at the outset of the state's involvement in a child's life.

Additionally, in allowing appellee to assume the status in this case that she did, the trial court failed to recognize there is an inherent conflict in the roles appellee took upon herself, that of both a foster parent and also an intervenor seeking not only termination of parental rights but an award of legal custody of the child. *In re Rose* (May 21, 1992), Cuyahoga App. No. 62493, unreported, 1992 WL 110289; *In re Ring* (June 28, 1994), Franklin App. No. 93APF–12–1693, unreported, 1994 WL 312904.

Foster parents are not required to be afforded party status. *Id.;* see, also, *In re Franklin* (1993), 88 Ohio App.3d 277, 623 N.E.2d 720; *In re Winkle* (Mar. 31, 1997), Butler App. No. CA96–11–236, unreported, 1997 WL 148555; *In re Rundio* (Sept. 8, 1993), Pickaway App. No. 92CA35, unreported, 1993 WL 379512. It has been the practice to permit foster parents to intervene only in order to aid the trial court in the full development of relevant evidence. *In re Parsons* (May 29, 1996), Lorain App. No. 95CA006217, unreported, 1996 WL 285370.

In this case, however, the inherent conflict in appellee's roles led to the confusion of many issues, the admission of improper evidence at the trial, and a result that is completely at odds with the statutory framework. It is for this reason that R.C. 2151.415(A) does not provide that a foster parent may file a motion either for termination of parental rights or for legal custody. The majority opinion's endorsement of the trial court's error is not only unfortunate but is fundamentally wrong.

---

4. In this context, it should be noted that the majority opinion does not address the fact that although the only competent expert testimony on the mother's fitness to parent was equivocal, appellee never was evaluated concerning her fitness to parent. Therefore, understandably, it avoids actually stating the trial court's award of legal custody of the child to appellee was "in the best interest of the child."

For the foregoing reasons, I would sustain all of appellant's assignments of error, reverse the trial court's order in its entirety, restore both the mother's parental rights and the agency's temporary custody, and remand this case for further proceedings in accordance with Ohio law.